May it please the Court, my name is Kyle Shelton, and I represent the appellant, Billy Malone. I would like to reserve three minutes for rebuttal. That's fine. Please watch your own time. Thank you. I hope to discuss this morning two issues. First, that we have pled a plausible Bivens conspiracy claim, and second, that that claim is well within the statute of limitations. The Iqbal Court found the plaintiffs did not plead facts that pushed the defendant's claim to be lawful into the unlawful. The National Park Service defendants in this case, their actions start at the unlawful and continue from there. Months after the National Park Service seized 6,000 items of Billy Malone's property from his home outside the scope of a search warrant, NPS actors --- Let me suggest that it might be more useful to do it in the other direction. The problem, as I see it, is that the facts that you're relying on with regard that are within the limitations period largely go, I think all go, to an asserted cover-up. Is that right, that all the facts within the time period don't go to the seizure because he already got his property back? No. He did not get his property back until almost a year before we filed this case. He was given his property back, a bulk of his property. To make it simpler, there's numerous pieces of his property kind of floating around the State of Arizona and Colorado during this investigation. The bulk of his property was seized from his residence. That's around 6,000 items. And that was taken to Tucson. And then some other property of his was found in a room called the Bally Building, which was on the Hubble Trading Post property. Some of that property and some consignment goods were also taken to Tucson. And then some other property of his was taken from the Bally Building and taken with Clyde Yee, who was at the time the criminal investigator from the National Park Service. And that was taken to Clyde Yee's office in Colorado. And so the timeline of when his property is returned is the bulk of his property from his residence is returned in July of 2006. And then the rest of the property, both from the consignment property and his property from Tucson and the property from Colorado, is returned in 2007. So all of his property is in return. When, 2007? It's in early 2007, the exact date we don't have. But you listed in your reply eight acts that you were trying to bring within the statute of limitations period. Are you expanding that? I think there were eight that you identified. Well, are you trying to expand beyond that? No, the facts that we have here are effectively that the issue of the statute of limitations, first of all, before even the property is returned, the conspiracy to keep his property and sell that property. Although that happens before 2006, it happens in the fall of 2005. Those are facts that he doesn't know until mid-2007. It's Paul Berkowitz, who's the second criminal investigator put in charge of the case, who informs Billy's attorney, Billy Mullen's attorney, that there was this conspiracy to, after they seized your property, to sell it. Right. Right. We got that. But I'm trying to focus your argument. I think we've – I think Judge Marzano was suggesting, and I'd like to echo that. If the activities that you're relying on to avoid the statute of limitation don't get you outside the statute of limitations, then maybe other issues are mooted out. But so you did take the trouble to, in your reply brief, list out what you thought brought you within. And you do agree that we follow the overt acts doctrine. Is that correct? Well, I mean, under Garcia v. Brockway, you can follow the discovery rule, which says that he has to know the cause of his injury. And he doesn't know the cause of his injury, again, until mid-2007. Well, he knows that the cause of his injury was that a bunch of people came to his house and took a lot of property. Well, he knows the existence that his property – I would disagree. I think he knows the existence of the – that his property was taken. But he doesn't understand why they've taken it, and he doesn't understand that they're going to sell his property. That's the key. In general, that discovery runs from the knowledge of the injury, which he had. Well, it runs from the injury, and then, again, under Garcia v. Brockway, it runs from the cause of it. He understands that, you know, they've taken his property. He doesn't – what he doesn't know is that they've taken it and they're going to sell it, that they're going to sell it. And then, once it's clear the criminal investigation is done, once Paul Berkowitz determines that this is going to be taken to the Office of the Inspector General and the investigation is going to go from a criminal investigation against Billy did, once that happens, they still don't return the property, and that's when a new act comes in, which is Leanne Simpson, the executive director of the WNPA, and Mike Snyder have a conversation, which they discuss keeping the property, selling the property. Once the criminal investigation is over, they still don't return the property, and they still move forward with trying to sell it. When was that? That was in – I believe the conversation is sometime between late July, early August of 2006. It's after they return the bulk of his property, but before they return the property that Mr. Yee had. And, again, Mr. Yee had – And when was the lawsuit filed? The lawsuit was filed in February of 2008. February of 2008. So Clyde Yee had boxes of Billy Malone's property up in Colorado, which included $10,000 in cash, firearms, a ceremonial wedding blanket that had the name Malone woven in in block letters on the blanket. None of that is returned. None of it is informed. When they give him the bulk of his property back, they don't say, by the way, Clyde Yee still has boxes of your property up in Colorado. And that property is never turned over to anybody until the Office of the Inspector General discovers it when they go to Clyde Yee's office. And that's the property that Liam Simpson, Clyde Yee, and Mike Snyder are talking about effectively selling, because that's what Liam Simpson says is when the investigation was funded – So I kind of share Judge Fischer's confusion here, which is that you're now coming up with a bunch of activities within the limitations period which don't seem to be the ones that were in the list in your reply brief. Is that right or wrong? Well, I think our reply brief, maybe it's not specifically in those in that list, but in our reply brief, we discuss all of these issues concerning the subject. Well, but the problem – see, the problem with most of what's in your reply brief in terms of what you say were the overt acts within the time period is that they seem to go to a cover-up conspiracy rather than to continuing the seizure, the – and retention and sale of the property. Now you're talking about things that happened, you say, within the reply – within the limitations period that are connected up with a decision to continue, essentially, to continue the seizure of the property. Well, you could argue that, yes. But you could argue that the decision to keep the property and sell it once the criminal investigation is over is a new conspiracy. You could argue it's a continuation of that conspiracy. Regardless, in the cases that they cite, a cover-up can be part of the conspiracy. There's no – they seem to be trying to argue that a cover-up has to be a separate issue. It can, but there have to be overt acts. You know, you can keep discussing it, but if they aren't overt acts of actually doing something that's – you know, people can make all sorts of statements, whether they, in fact, do anything on those statements. So it's a two-part test. You can establish that there may be a conspiracy, but you then have to have some overt act in furtherance of it to state some claim. Because if you and I just sit around talking about we're going to rob a bank, but we never do, then ultimately there's no conspiracy because there's no overt act. The overt act in this case, in terms of – you know, the one we can focus on, is Mike Snyder and Liam Simpson decide, let's keep this property and you can sell it. And then Liam Simpson tells Paul Berkowitz, I'm going to keep the property, I'm going to sell it. And Paul Berkowitz – So it was essentially not giving back the property. Not giving back the property. First of all, every day – With an intent to sell it. With an intent to sell. With an intent to sell. Every day that they keep the property – first of all, it was, again, seized without a warrant, so they know that they have it illegally. They didn't have a warrant to seize it. They don't have a warrant to keep it. So every day that they keep that property is an overt act. Every day they keep it. They're illegally keeping it. And then once it's clear the criminal investigation is coming to an end and that Billy Malone is not going to be charged with anything criminally, then they decide to still keep the property and then come to the decision that they're going to sell it. Now, Leanne Simpson tells Paul Berkowitz, who's effectively the one who ended the investigation and said there's nothing here to criminally investigate, Paul Berkowitz says, you can't keep it. You can't do that. That was improper for you and Mike Snyder to have discussed. And she says – Well, the discussion, again, as Justice Fischer says, is not an overt act. Well, they don't – they make the decision. You should keep it. You should keep the property and sell it. And she says, I will do that. And that's what she does. And there was some period of time in which they kept it before Berkowitz got involved? This is – this is – no, this is – Within the limitations period. This is within the limitations period, correct. And there was some period of time within the limitations period. This is after Paul Berkowitz has already returned the bulk of the property. So he's already returned the bulk of Malone's property. And then Leanne Simpson says, don't return the property from his office. Don't return that. Who says it to whom? To Paul Berkowitz. So Leanne Simpson – But that's not an overt act, because Berkowitz isn't part of the conspiracy. Berkowitz is not part of the conspiracy. But that shows her intent to keep it and her intent to sell it. And she and Mike Snyder have come to that agreement. And Clyde Yee, who is the one who told Leanne Simpson years before, we'll just sell the property to help you fund the investigation. Okay. But what's the overt act? That is the – the overt – That's a discussion. What's the overt act? The overt act is the agreement. The agreement will keep – An agreement is not an overt act. So what's the overt act? Well, I mean, there is no case law specifically that says what is an overt act and what is a continuation of the conspiracy. But, you know, we would argue that the overt act is that agreement. They say let's do it, and then they attempt to do it. That's the overt act. They attempt to do it. Well, that's the question. What do they do? They don't give it back, and they attempt to sell it. They don't succeed in that. But I don't – you don't have to show for the specific reason. So what I'm trying to find out, was there some period of time before – after these discussions and before Berkowitz said, yes, you are giving it back, when they kept it and said, you know, when he – they were told to give it back, but they didn't give it back? Well, effectively, that doesn't happen because the Office of the Inspector General discovers the property before anyone can even officially order them to give it back. They go to – Paul Okerberg in January of 2007 goes to Clyde Yee's office in Colorado, walks in the office and discovers boxes of his personal property, and then takes it then, boxes of his personal property. We have no indication that Clyde Yee, Leanne Simpson, or anyone was intending to tell anyone about that property, giving that property back. There's no indication. So before they even have a chance to sell it, it's taken by the people who are there. The Office of the Inspector General has investigated the National Park Service and what they've done in this case. They take it back before they have a chance. You don't have to have the conspiracy be successful in that way. If they had sold the property, that would have been, you know, a stronger conspiracy case. But they didn't get that far. They were unsuccessful. Well, I understand they didn't sell it. I'm trying to find out whether there's a period in which they, quote, kept it when they would otherwise have sold it. They should have given it back. I have – have returned it. They should have given the property back once it was clear the criminal investigation against Paul Berkowitz. Right, exactly. Paul Berkowitz determines that there is no criminal action in – around July of 2006 when he gives back the property. In November of – second of 2006, the Office of the Inspector General takes over the investigation, which effectively ends the criminal investigation against Billy Malone. And then, if you want to even go further, Rob Long declines to prosecute in January of 2007, and none of it is given back during any of this time. None of it is given back. It's all given back after all of that. So they never – they never give the property back once they realize the criminal investigation. So simply stated, forgetting all the other stuff, your simplest argument is that the retention of the property until January 17, 2007, was an overact, and the case was filed February 28, 2008, well within the statute. That's your – that's the guts of your argument. Correct. So this property was illegally seized, kept every day as an overact, keeping this property they shouldn't have had in the beginning, and the decision to keep it and try to sell it was again another overact. And you can even go – if you want to go to a final overact, in – after Okerberg takes the property from Yee, Clyde Yee, Smith and Buccello, National Park Service agents, then try to rehabilitate the chain of custody despite the fact that the Office of the Inspector General has ordered them to stand down. So the Office of the Inspector General says, National Park Service, you're out of this investigation. Don't interfere. And once it's clear that they now are taking the property back, once it's clear that that property – But that would be more of a cover-up than a – than the original. And the cover-up is part of the original conspiracy based on – Well, how do – I mean, but that's a whole problem in itself. That is a whole problem. That's a whole problem and so on as to whether it is or isn't an – That's another issue to be discussed. All right. You've exceeded the time that you want to reserve, so thank you very much.  I appreciate it. Ms. Coyle, do you – he's complaining a lot of facts and a lot of principles and just making a mess of what is plain and simple. There is a complaint here. You go by what's alleged in the complaint, not in some book that supposedly made part of the record later. You go with the facts as alleged in the complaint. And when you look at the facts alleged in the complaint, they didn't state a plausible claim. I'm sorry. Did you identify yourself? I'm sorry. I'm sorry. I'm Janet Martin from the United States Attorney's Office. But I am in this instance not representing the United States. I'm representing seven individuals that have been accused of this Bivens violation. And they are Clive Yee, Stephen Martin, Sid Martin, Mike Snyder, Carl Davis, Patricia Buccello, and Brian Smith. Well, with respect to at least some of them, Yee and one or two others, why isn't the district court wrong with regard to whether at some point, whether the complaint is sufficiently plausible to demonstrate a conspiracy, at least inferentially, of the kind that's being described? Forget the book and so on. Just in the complaint. Just from the complaint yourself, well, and I can explain this. I think what happens within the complaint during this argument is that they start talking about searches way beyond the search alleged in this case. This whole case supposedly stems from the illegal seizure of property during the execution of a search warrant at his home. And from the failure to return it, no? And the failure to return it. But now they're talking about his property that didn't necessarily come from the seizure at his house, but came from the Valley Building, which is WPN property. But it's still his property. And from his office. But you have to have an interest in an illegal seizure. There's nothing in this that says that that property was illegally seized. That's not alleged in this complaint at all. So how can you now then say, oh, well, there's no facts in here that say that that property that was taken from the Valley Building was taken in violation of his constitutional rights? Because clearly, under Ting, you have to have an express and implied agreement to deprive somebody of their constitutional rights. And there has to be actual deprivation. The way that the complaint alleges this is that it came from that he was deprived his Fourth Amendment rights with the seizure that took place at his house. Look at the complaint itself. There's nothing in the complaint to suggest. I'm sorry. We're not a jury. I know. And I'm used to being a trial attorney. I know. But it doesn't advance your cause. I know. But it's my personality, and I can't change that. So anyway. So we've got a situation here in a complaint where they say that they just make these conclusory allegations that this was an unconstitutional search and seizure. What they're complaining about are chain of custody issues, not inventorying property properly, and that is an illegal search and seizure. As to which property? I'm sorry. His property that was taken from his house. Well, no. What they're complaining about was that there was, as I understand it, was that there was no probable cause to think there was a crime or to seize the property. And that's all conclusions. There's nothing in here that states why those are. That's the whole point of it. Well, one of them is that the Federal government had no interest in this, that there wasn't any Federal jurisdiction over any of it anyway. They admit that there was a warrant that was issued by a judge, a magistrate judge. Right. But they also allege, I gather, that although it says that the Federal government was getting a percentage of this, it wasn't.  Why? Because there was nothing. If it's alleging a Federal crime. There was nothing. Just a minute. If it's alleging a Federal crime that doesn't exist? That's not what the – that's not – that's not the facts. When you look at the warrants, you see that they allege bank fraud and that there were forged checks and they were looking for forged documents and checks and items. And when they come into this house, in plain view, there's nothing. And they also say that they seized way more than the warrant allowed and that they spoke to each other, one from the private organization and one from the National Park Service, and decided to take all this property, physical property that wasn't in the warrant. Yes. There were numerous Navajo rugs that were in plain view that belonged to the company WPNA that was consignment property brought there that had tapes from the Hubble Trading Post on them, and they seized them. Yes, Your Honor, they did, because they were in plain view and they were evidence of the crime. Of what crime? The theft and embezzlement. It's clear that there was that – that they were in plain view. And they didn't have to go back and get – and they shouldn't have gone back and gotten another warrant? The fruit of the poisonous tree, I mean, it's right there in plain view. You do not have to go back and get another warrant. What does the fruit of the poisonous tree have to do with anything? Well, the reality is that they did not allege this right. Whether or not you want to say that was wrong, there was a statute of limitations problem that all the people involved in this case. Well, that's a whole different issue. All right. I mean, you're going all over the place. What are we discussing now? Are we discussing whether there was a sufficient allegation of a unconstitutional search? Are we discussing whether there was a sufficient allegation of a conspiracy? Are we discussing whether there was an override act during the statutory period? Or what are we talking about? I'm trying to point out to the Court that the way that the complaint, when you look at the complaint, it arises and it stems from the legal supposed search and seizure of his house. And that's what is involved. That's the, under Ting, would be the actual rights supposedly, allegedly violated, his Fourth Amendment rights. But if there's property that's taken of his and it's not pursuant to a legal search or seizure that's from some other building. And if the building, if there's property of his in another building that people know is his and they take it, that's not an unconstitutional search? A seizure? It's not alleged. And we have no facts to make that basis from, because it's not alleged. It's not alleged in the complaint. It is alleged that they took this property and it was his property and it was in the Valley building. The complaint doesn't even really, no, it doesn't exactly say that. You have to look very carefully at what is left out of the complaint as well as what's contained in it. It doesn't make those specific allegations. It's said in pleadings, but it's not said specifically in the complaint. This is a very long complaint. He was given two opportunities to try to correct it. The court did not abuse its discretion when it refused to let him to amend again. The court made very good findings that are supportive when you look at it. It's very logical and it makes sense. And the statute of limitations, it's way beyond that. Okay. So is it your theory that in terms of the statute of limitations, what we would be looking at would be only the period of time that relates to retention under counsel's theory. So we ignore retention of the items that were his personal property seized from his house, and we ignore the other property apparently that was in Yee's office that he relies upon to say that, as I'm understanding his argument, that even if he got back his residential property, he still, there was property of his that they found in Yee's office. Yes. Because the complaint does not allege that the property taken from any other place other than his home was in violation of his Fourth Amendment rights. Okay. So whatever conspiracy there was to violate his constitutional rights is limited to property seized and retained from his home, and that that was returned in, I don't know when. On July 12th, 2006. Six, right. So that would be the appropriate bundle of possessions from which we would then judge whether there was anything that was done in furtherance of that allegedly illegal conspiracy to violate his rights in his home. That would be the framework for the statute of limitations. Yes. Because if you take two years from the filing of the complaint, that takes you back to February 28th, 2006. Okay. Even he, in his complaint, alleged the conspiracy was over by January 31st, 2007, and we know that that property, according to the complaint that they wrote on two January 31st, 2006, he, the only thing. That property being the property from his house. Right. And then he, according to, and during that time frame, the only thing, he was off this investigation in 2005. The only thing that they're saying, and Berkowitz had taken it over. The only thing that they claim that he did after that period of time is that he had some property in the war room and there was some property in his office that Berkowitz obviously had not bothered to take a hold of or look at. And when he found it, he called to say, hey, look it. You know, there's this stuff I found. He reported it. That's not concealment. So there was some of his property in Yee's office. That's, no. What I'm saying is when you read the complaint, it says they found further property. It doesn't say that it was, where it was taken from. Now they're talking about guns. Well, but it got returned. You just said Berkowitz said, hey, look what we found and returned it. So that implies that it was his property. The property that was, no, no, no, no. You're mixing up the two things. Berkowitz took stuff that had been taken from the seizure from the house. Yeah. And they went to Warehouse and they picked it up and it was returned to the plaintiff. On July 12th. On July 12th. Okay. And then later. What they said later is that Yee called after OPR came in and they were looking at the war room where all the evidence was assessed. Yes. Which the complaint doesn't say who's in charge of that war room. I assume Paul Berkowitz had been the investigator, so you would assume he was in charge of that war room or knew about it. Yes. And that Yee called and said, oh, you know, I found some other property here after they left. And that property, if it's there, he called to let them know it had been found. That doesn't show an actual intent to conceal anything. It's not even known. Under your theory, if that were property not from his home, it would be irrelevant. Yes. In any event. But you're saying we don't know from the allegations whether some of his home property was part of that. Correct. Okay, so. And when did that get notified or returned? I believe — I don't know when it was returned because it's not alleged in the complaint. Apparently, what is in the complaint — it's a very complicated and long complaint, but in Numbers 164 — 5 and 6, for example, it said that some of the material that was found in Yee's office were boxes of property with thousands of dollars in cash and checks made out to Billy Malone and his family, also a number of guns belonging to Billy Malone, as well as the valuable family wedding blanket he had asked about in Tucson back in April of 2006. Is that right? Yes. And that material was found in Yee's office. That's what the complaint alleges. All right. Well, that's not an allegation that Yee has his property in his office? What the judge was asking me about was whether that property came from another place or not, and there's no allegation that this came from Malone. Well, he does say the wedding blanket story goes through the complaint, and the wedding blanket was supposedly in his house, had his name in it, Malone. That's one of the reasons they claim that they — or maybe it wasn't in the house. Maybe it was with the tags on. And they said, well, he must have known this was actually his. And then he apparently has been asking about this blanket, and now it shows up in Yee's office. Is that not right? I — the fact that there's a blanket in Yee's office or in the war room. I mean, the way this complaint is so poorly written, and it doesn't make sense, and you have to go backtracking to try to figure out what's going on. But when you look at it, that doesn't — the fact that's not overt act for Clyde Yee to call up and say, look, there's something else that was overlooked. That doesn't mean that it's a constitute deprivation that's caused him damage. Let me ask a quick question here. I understand, based on what you've just said, that on July 12, 2006, the — Billy Yee's owned property was returned to him. Is that correct? Yes. And that's what's alleged. Okay. Just ask the question. The case was filed then on February 28, 2008, which is if the last overt act is the property, his own property, and the case is filed within two years of that, why has the statute of limitations expired? If — well, I won't even ask that if. Why has the statute of limitations expired? Because the property, his own property, was returned within those two years. Are you with me? No. Okay. He says the failure to return the property is an overt act. The — taking your side of it, the last overt act is the return of his property. That occurred July 12, 2006. 2000 — it could have been July 13. The case is filed within two years of that, on February 28, 2008. That's less than two years. So if the overt act is the retention of the property until July 12, why is there not an overt act that occurred within the two-year statutory period? Because — Am I clear? Yes. Because, bottom line, there's no meaning of the mines for conspiracy. All right. So you're essentially conceding there's no limitations period in which it comes to the meaning of the mines? Is that what's — I mean, you keep switching. Are we — No. We're trying to find out whether there is an overt act within the limitations  I don't think that's — Judge Quist has just pointed out that for about six months during the limitations period, they were holding this property that he says was unconstitutionally seized and continued to be unconstitutionally seized. Is that not sufficient for it to be an overt act within the limitations period? Then we can go to your other argument, i.e., there was never a conspiracy in the first  No, because I don't think the complaint is written, says that this property, even the wedding blanket or whatever, was — No. The property taken from his house. The property taken — when was the property taken from his house returned? Okay. It says that was returned on July 13th, 2006. Right. So, therefore, from — during the limitations period, between February and July, it was not returned. Justice Breyer. Is — are you conceding his argument that every day that you — the government held on to his property, it was an overt act? No. Why not? I'm not conceding that. I'm conceding — I'm saying that for purposes of the statute of limitations, you look at Gibson, and you look at the overt acts, and you have to show that they caused him damage, that last act had to have caused damage as well. Well, whatever his damages are come from not having access to his property, regardless — I mean, whether it's within or without the statute of limitations, his damages will be loss of use of his property. But before that, you have to have a constitutional deprivation. Well, it was. And the only constitutional violation that's alleged is the Fourth Amendment. Yes. I've got that. Okay. So we got your property through an — let's just assume, an illegal search and seizure. Let's just assume that's what he establishes. And I didn't get my property back until July 13th, 2006. And every day that I was without access to my property, let's say it was my computer that had all my financial records on it, and I really needed it. So every day that the government deprived me of access to my computer, I was damaged. And the damage ended the day I got my computer back. No, because of 41G. There was Congress set up a mechanism by which people can go. Okay. But that, again, that's a fourth issue. But we're trying to be orderly about this. All right? The question is what — that's the question of whether he has a cause of action interdependence. But let's stick to the limitations question for a moment, all right? Or maybe for more than a moment. If, as — are you agreeing or disagreeing with Judge Fisher's characterization that there was an overt act during the limitations period, i.e., keeping the property? No. Because he knew of the seizure at his house. He was present when they did it. And it's in the complaint that he was present when they took the property. So he was aware of the loss of the property. And when you're aware of it, the case law is that's when your action accrues. But that's not the law. But he wasn't aware they were going to keep it beyond the period that they determined that he wasn't responsible — criminally responsible. The law is the law. And after Wallace v. Cato and these other cases, it's clear when you're aware of the constitutional violation, that's when it accrues. But that's why conspiracy law is different, right? Because this was an allegation of a conspiracy. No. Because conspiracy law doesn't give you more rights than if you can't even prove the underlying violation of the Constitution. Well, you might want to tell that to the Federal Government when they prosecute criminal conspiracies. This isn't a criminal prosecution. I understand that. But the basic principles are the same, as I understand it, in terms of the statute of limitations issues. Well, but the basic principle is that you have a remedy in a criminal case when they retain your property, and that is to go under Rule 41G and get that property. And that's the mechanism that Congress set up to do it. Whether you get money damages from it or not doesn't matter, as has been in Western in the cases, the APA case here in the Ninth Circuit and under Wilkie. You may not have a complete remedy, but that's the remedy that he had. And he was put on notice that he had. You're very far over your time. Thank you very much. We'll give you three minutes in rebuttal, because there was extra time on the other side. Go ahead. Just briefly, on 41G, there was no criminal prosecution, so you can't have a 41G remedy if you don't have criminal prosecution. My understanding is that that's not so. That there is a per or that essentially a criminal civil analog has been applied under 41G, and you could file a petition in Federal court. Is that wrong? That's wrong to my understanding. My understanding is that under Ninth Circuit case law, you have to have a criminal prosecution in order to file 41G. Even if you were to file a 41G form, you'd have to have an inventorying of your property to say this is the property I want back. No inventory was done on the day that it was seized. It was months later that they tried to create an inventory. And then more importantly, and I think this is what I kind of want to focus on here based on a lot of the arguments that were made, was that the property that was taken to Colorado was never inventoried. Billy Malone was taken from the Valley Building as our allegation. Well, what about the notion that the Valley Building allegations, and I've looked through them at least briefly, are somewhat wanting in that there doesn't seem to be a direct allegation that taking the property from the Valley Building was a Fourth Amendment problem, or from not giving it back? Clyde Yee from the National Park Service took Billy Malone's personal property from the Valley Building without a warrant, without any cause. But they say, and in fact, there's one place where Simpson says, I don't know whether it's his property or not. That she would not know. She said she didn't know. She says that there's no way to prove it. She said she didn't. In your complaint, it says, I don't know. She didn't know. She said she didn't know. She also says there's no receipts to prove what would be what. But that's not even the Yee property. The Yee property is very clearly Billy Malone's. And Clyde Yee knew it was Billy Malone's. And if you look at me. And that was from the Valley Building? And that is our – we've alleged it's from the Valley Building. I was hearing arguments that it was from his personal property. Our facts have been the Valley Building. And in fact, a number of the facts that were alleged up here are facts that our complaint disagrees with. And if we're going to be arguing over the facts, then the motion to dismiss was improper and this needs to go before a jury and try our fact. But to the NPS property that was in – or the property they had taken that was up in Colorado, I mean, you know, if you look at our facts and our complaint, specifically in paragraph 193, we allege that Clyde Yee took Billy Malone's personal property from the Valley Building without a warrant, took it to Colorado. Billy Malone wasn't aware of what property was taken from the Valley Building, wasn't aware of where it went. And then – And that Yee knew it was his property? He knew it was – he had – Is that in the complaint? Yes. That Yee knew that this was Malone's property? As you mentioned, one of the property was a rug that had the name Malone woven into the rug. And it was a ceremonial wedding blanket that was given to the Malone family that he asked about numerous times. Clyde Yee has that blanket in a box in his office, and the only time it finally gets back to Billy Malone is when the Office of the Inspector General agent discovers it. Clyde Yee doesn't bring it to anyone. It's only when it's discovered in his office. And there's a big discussion about whether the war room is Clyde Yee's office, Paul Berkowitz would know about it. Paul Berkowitz hadn't been to the war room or Clyde Yee's office in Colorado. That's Clyde Yee's office, that's Clyde Yee's war room, and Clyde Yee had boxes of his personal property that he seized without a warrant. That's a Fourth Amendment seizure, an illegal seizure. He took property. And it's important to note that Billy Malone. But what exactly is the relevance of this, isn't it? Or the necessity of it, in the sense that some of the property, oh, as Judge Quist just pointed out, there's something wrong with this. The property that was taken from his house wasn't returned until within the limitations period. Agreed. We agree. So the rest of it's kind of spinach. It's either the retention matters or the retention doesn't matter. Because if the retention matters, they retained for six months within the limitations period the property taken from the house, which was what was alleged throughout the complaint to be the unconstitutional search and seizure. Yes. But if you look at it, there basically are two unconstitutional seizures. There's a seizure from his property where they had a warrant that went outside the scope of the warrant. And then there's the seizure they took from the valet. But if we're looking for an overt act, why should we possibly get to the valet property with all its complications if retention is an overt act? You don't have to get there if retention is an overt act. You don't have to. But if one were to have to, you would be able to do it there, too. I'm just we're just trying to give the Court all of the examples and areas in which you can show that it's well within that statute of limitations. Where does it allege that the seizure from the war room was an unconstitutional seizure? Well, it's in 193, it mentions the seizure in our complaint. 183? 193. 193. It says he took property cash and checks at Billy Malone's to Colorado and failed to disclose that he had that property. So it doesn't say specifically the words Fourth Amendment seizure violation, but it's in the complaint that's alleging illegal seizures across the board. And that was obtained from his home? We have claimed it's from the valet building. I heard here from counsel today. Where did you claim in the complaint it was? I thought counsel's argument is that the complaint alleges after is an amended complaint that the illegal seizure was of Billy Malone's property from an illegal warrant or scope of warrant in from his home. Okay. That's in the complaint. Correct. Okay. Now, where is it alleged in the complaint that there was a separate constitutional violation in a different activity by the government that was illegal that violated his Fourth Amendment rights? Well, the complaint alleges that there was a seizure of his property in various parts of his either his home and the Hubbell Trading Post that was illegally seized. And where is that? Excuse me. Where is that alleged? Sorry. I didn't mean to interrupt you. In paragraph 193, it's alleged that he took, it goes into detail, the property that he took and that he didn't inform Billy Malone. But that doesn't allege a separate activity. That just alleges that ye took some property. There's nothing illegal or constitutional alleged about that. Is that an implicit Fourth Amendment claim that he violated his rights within a government building? It's not, first of all, it's not a government building. I mean, the Valley Building, it makes it, it's hard to understand when you talk about Billy Malone. Billy Malone ran the entire Hubbell Trading Post. Well, all I'm trying to do, counsel, is if you'll direct, we have to read the complaint. I mean, that's what was before the district court. And the theory of the government is this case was about the initial seizure from his house. And that, and I understand that aspect and as every day that they, if that wasn't a legal seizure, that they kept it. Your position is that's an overt act. Okay. Now we, you had opened with this saying, well, there is also the seizure from his office in the Valley Building. So where is the, where is that act identified as a Fourth Amendment violation? Paragraphs 159, 160, 161, 162, paragraph 193, these detail Clyde Yee had taken illegally Billy Malone's property and kept it in his office. Okay. That's where it shows up. Thank you very much. Your time has expired. Thank you so much. The case of Malone v. Yee is submitted. The last case of the day, Hacienda Management v. Starwood Capital has been submitted on the briefs and we are adjourned. Thank you very much.
judges: Quist, Fisher, Berzon